UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| VAN STARLING, | ) | C/A No.  4:15-3636-TLW-TER |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| BRYAN P. STIRLING, DIRECTOR SCDC; MICHAEL | ) | |
| McCALL, DEPUTY DIRECTOR SCDC, MS. | ) | |
| MITCHELL, CKI/MSU CASEWORKER, LARRY R. | ) | |
| CARTLEDGE, WARDEN PCI, CURTIS EARLEY, | ) | |
| MAJOR PCI, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PROCEDURAL BACKGROUND

The Plaintiff originally filed this action in the Court of Common Pleas for

Greenville County, State of South Carolina.  Defendants filed a Notice of Removal

to the United States District Court, District of South Carolina, pursuant to 28 U.S.C.

§1441 and §1443 and an answer.[1] (Docs. #1 and #4).  Plaintiff is currently housed at

the Perry Correctional Institution (PCI). On October 29, 2015, the court granted

Plaintiff's motion to amend his complaint and an amended complaint was filed. (Docs.

#15 and #16). On January 18, 2016, Defendants filed a motion for summary judgment.

---

[1]All pretrial proceedings in this case were referred to the undersigned pursuant to the
provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d),DSC. Because
this is a dispositive motion, the report and recommendation is entered for review by the District
Judge.

As the Plaintiff is proceeding *pro se*, the court issued an order on or about January 19, 2016, pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the motion for summary judgment procedure and the possible consequences if he failed to respond adequately. Plaintiff filed a response, Defendants filed a reply, and Plaintiff filed a sur-reply. (Docs. #53, #59, and #62).

## DISCUSSION

## STANDARD FOR SUMMARY JUDGMENT

The federal court is charged with liberally construing the complaints filed by <u>pro se</u> litigants, to allow them to fully develop potentially meritorious cases. <u>See</u> <u>Cruz v. Beto</u>, 405 U.S. 319 (1972); <u>Haines v. Kerner</u>, 404 U.S. 519 (1972). The court's function, however, is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, <u>Weller v. Dep't of Social Servs.</u>, 901 F.2d 387 (4th Cir. 1990), nor can the court assume the existence of a genuine issue of material fact where none exists. If none can be shown, the motion should be granted. Fed. R. Civ. P. 56(c).

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact

2

and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a);

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment is proper if

the non-moving party fails to establish an essential element of any cause of action

upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317.

Once the moving party has brought into question whether there is a genuine dispute

for trial on a material element of the non-moving party's claims, the non-moving party

bears the burden of coming forward with specific facts which show a genuine dispute

for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio

Corp., 475 U.S. 574 (1986).  The non-moving party must come forward with enough

evidence, beyond a mere scintilla, upon which the fact finder could reasonably find

for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and

inferences to be drawn therefrom must be viewed in the light most favorable to the

non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However,

the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory

allegations to defeat a motion for summary judgment.  Barber v. Hosp. Corp. of Am.,

977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on must meet "the substantive

evidentiary standard of proof that would apply at a trial on the merits."  Mitchell v.

Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings.  See Celotex, 477 U.S. at 324 (Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves). Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with  . . . affidavits, if any." Id. at 322; see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## ARGUMENT OF PARTIES/ ANALYSIS

Plaintiff asserts a claim due to his confinement in SMU (restrictive housing) as an MSU inmate at PCI during the pendency of an investigation by the FBI into his involvement in a murder-for-hire scheme that resulted in the shooting of former Captain Robert Johnson, a contraband officer at Lee Correctional Institution (LCI). Specifically, Plaintiff contends that his status has caused him to be denied food such as chicken and pancakes, it has required him to eat on a styrofoam tray, he receives one hour a day for inside exercise but has to remain in restraints, he has to remain in cuffs when he is allowed limited visits, he missed the opportunity to shower on six

occasions during a two-month span in 2013, and he is denied other privileges that the Restrictive Housing Inmates and the general population receive.

The Defendants contend that Plaintiff was implicated in a murder-for-hire scheme that resulted in the shooting of former Captain Robert Johnson, a contraband officer at LCI. Defendants assert that Plaintiff has been implicated as the likely ringleader in that scheme who ordered and paid for the hit on Captain Johnson. In June 2013, Plaintiff was moved to the Restrictive Housing Unit at PCI but has remained classified as an MSU inmate. The Defendants set forth the following background/history:

> By way of background, on March 5, 2010, Captain Robert Johnson, a contraband officer at Lee Correctional Institution, was shot multiple times at his residence in Sumter County. See Patterson Aff., ¶3. An investigation was initiated by the South Carolina Law Enforcement Division (SLED) with assistance from the SCDC Office of Inspector General, Division of Investigations, and the Sumter Police Department.    See Patterson Aff., ¶3. Thereafter, in September 2010, the Federal Bureau of Investigation (FBI) assumed the complete control of that investigation. See Patterson Aff., ¶3.
>
> As Dennis Patterson attests, "[t]he initial investigation in early March 2010 developed evidence that indicated that Inmate Starling was involved in the murder-for-hire scheme. Evidence was developed that implicated Starling as the individual who ordered and paid for the hit on Captain Johnson. That evidence consists of statements from a confidential informant and other witnesses as well as cellphone calls between Starling and Sean Echols, who

5

is believed to have been one of the persons present when Captain Johnson was shot." <u>See</u>, Patterson Aff., ¶4.

After the FBI assumed control of the investigation, charges were brought by the United States Attorney against Sean Echols. . . On April 9, 2014, more than four years after the events, Echols pled guilty in the United States District Court on a conspiracy charge for his involvement in the murder-for-hire scheme. Echols was subsequently sentenced on August 13, 2014, to twenty years, with that sentence running consecutively with a sentence that Echols was serving in SCDC.

During the hearing on Echol's guilty plea held on April 9, 2014, Echols described his involvement and specifically mentioned the Plaintiff Van Starling by name. . . Later, during the sentencing hearing held on August 13, 2014, Echols again identified Van Starling as "The only person I can give.". . .

During that same hearing, the Assistant United States Attorney States that "[w]e always knew that Van Starling was involved" and "[w]e're trying to make the case against Van Starling." . . . Thus, the investigation against the Plaintiff conducted by the FBI and the United States Attorney's Office continues."

(Memorandum, doc. # 42-1).

Defendants argue that the continued assignment of the Plaintiff to restrictive housing as an MSU inmate due to an ongoing investigation by the FBI into his involvement in a murder-for-hire scheme is not in violation of the Plaintiff's constitutional rights. They submit that they are not in control of the investigation

being conducted by the FBI, and they are entitled to summary judgment on the Plaintiff's constitutional claims.

In support of their motion for summary judgment, Defendants submitted the affidavit of Larry Cartledge who attests that he is employed by the SCDC as the Warden at PCI and has held that position since June 2012. (Cartledge affidavit, doc. #42-2). Cartledge is familiar with Plaintiff who was transferred to PCI on June 25, 2013, from the MSU located at Kirkland Reception and Evaluation Center in Columbia. Id. Plaintiff has retained his status as an MSU inmate while housed in the Restrictive Housing Unit (formerly called Special Management Unit) at Perry. Id. Plaintiff was assigned to the MSU in March 2010 as a result of an investigation into the shooting of Captain Robert Johnson. Id. Plaintiff was then transferred to PCI because Sean Echols, another inmate implicated in the shooting of Captain Johnson, was placed in the MSU. Plaintiff was transferred in order to keep them separated for security reasons and to preserve the integrity of the ongoing investigation. Id. Cartledge attests that he has played no role in the investigation of the shooting of Captain Johnson. Plaintiff's potential involvement has been and continues to be conducted by the FBI. Id. Cartledge has no knowledge of the status of that investigation. Id. Cartledge did not participate in the decision to transfer Plaintiff from the MSU or the decision for him to maintain his designation as an MSU inmate while

at PCI. Id. Cartledge attests that he has been instructed to continue to hold Plaintiff in the Restrictive Housing Unit as an MSU inmate until advised otherwise by the Division of Operations. Id. Additionally, all classification reviews are investigated by the MSU Review Board rather than by classification officials at PCI. Id. Plaintiff remains assigned to the Restrictive Housing Unit at PCI and has been treated by PCI staff as an MSU inmate, meaning he has been subject to the policy provisions and restrictions applicable to an MSU inmate. Id. As to Plaintiff's complaint that he has been denied chicken and pancakes while these foods are served at times to inmates assigned to the Restrictive Housing Unit, Cartledge attests that the policy applicable to MSU inmates restricts access to any meats with bones and to pancakes, among other things. Id. The policy is enforced with respect to Plaintiff but he has not been denied meals. Id. When the meals include chicken or pancakes, Plaintiff receives a substitute. Id. As to Plaintiff's allegations that during a two-month period in 2013, he missed shower opportunities on six days, Cartledge denies having any personal involvement with providing showers to inmates in Restrictive Housing Unit, including Plaintiff, who are to receive three showers per week. Id. Cartledge asserts that he is not aware of the circumstances whereby Plaintiff may have missed a shower on the dates he has alleged, if that did occur. Id.

Defendants submitted the affidavit of Dennis Patterson (Patterson) who attests that he is employed by the SCDC as the Assistant Deputy Director of the Division of Operations, and has held that position since July 2015. (Patterson affidavit, Doc. # 43). Prior to this position, Patterson served as the Director, Region Two, Division of Operations, from July 2012 until taking the current position. Id. Patterson is familiar with Plaintiff's placement in the MSU (now referred to as the Substantiated Security Risk Unit or SSR Unit) and the reasons for that placement. Id. Plaintiff was implicated in the March 5, 2010, shooting of Captain Robert Johnson, a contraband officer at LCI, who was shot multiple times at his home in Sumter County. Id. The criminal investigation was initially conducted by SLED and the Sumter Police Department. Id. In September 2010, the investigation was turned over to the FBI. Id. The initial investigation in early March 2010 developed evidence that indicated Plaintiff was involved in the murder-for-hire scheme. Id. Evidence was developed that implicated Plaintiff as the individual who ordered and paid for the hit on Captain Johnson. Id. That evidence consists of statements from a confidential informant and other witnesses as well as cellphone calls between Plaintiff and Sean Echols. Id. Subsequent to the FBI's involvement in the investigation, Sean Echols pleaded guilty in Federal Court on a conspiracy charge for his involvement in the murder-for-hire scheme. Id. Echols was sentenced on August 13, 2014, in Federal Court. Id. A

targeted cell search on March 10, 2010, at LCI turned up a cellphone and charger in the possession of Plaintiff, and he was charged with Possession of Cellphone. Id. Plaintiff was convicted[2] of that offense at a hearing on April 1, 2010, before a Disciplinary Hearing Officer. Id. Based upon the initial investigation implicating Plaintiff, he was transferred from LCI to the MSU on March 10, 2010, as an emergency admission to maintain the integrity of the investigation. Id. The referral states that the admission to MSU will be for the duration of the investigation or any additional time needed to determine an appropriate institutional assignment. Id. Plaintiff received a hearing within seven days of the emergency admission.  Id. A hearing was held on March 17, 2010, before the Institutional Classification Committee Review Board. Id. Plaintiff was present for the hearing, as evidenced by his signature on Committee Docket, which is attached as Exhibit C.[3] Id. Plaintiff was provided five-day  notice of the hearing as documented by Exhibit D. Id. Plaintiff's placement was reviewed in April 2011 by Robert E. Ward, then Director, Division of Operation. Id. By letter to Plaintiff dated April 1, 2011, Mr. Ward confirmed that Plaintiff had been placed in MSU "pending an on-going investigation per the Division of Operations

---

[2] It appears that he lost thirty (30) days good time credit as a result fo this conviction. Exhibit H.

[3] It appears from the Committee Docket that the five members of the Committee voted unanimously to admit Plaintiff to MSU.

pursuant to SCDC policy OP 22.11." Exhibit F. He also indicated that his status as an MSU inmate would be assessed after the investigation concluded. Id. Additionally, he recognized Plaintiff had exercised his rights to appeal the decision of the institutional classification team, had received appropriate responses to the appeal, and Director Ward saw no reason to change his placement at that time. Id.  Plaintiff remained in the MSU until June 25, 2013, pending the ongoing investigation by the FBI. Id. On June 25, 2013, Plaintiff was transferred to PCI because Sean Echols had been admitted to SCDC, assigned to the MSU, and officials did not want Echols and Plaintiff housed in the same facility for security reasons and to maintain the integrity of the investigation. Therefore, Plaintiff was transferred to PCI where he was placed in the Restrictive Housing Unit but still designated as an MSU inmate. Thus,  MSU policy was applicable to Plaintiff while he was housed at the Restrictive Housing Unit (formerly Special Management Unit). Id. Plaintiff remains in the Restrictive Housing Unit as an MSU inmate. Id.

Since being transferred to PCI on June 25, 2013[4], Plaintiff has continued to receive his classification reviews[5] from the SSR Case Management Committee, which

[4] It appears that there are three levels of custody within MSU, Level I being the strictest degree of custody and Level III being the most lenient. Exhibit F. Although he limits his claim to the time period after June 25, 2013, it appears that while at KCI, he was generally housed as a "Level III" inmate which "refers to a larger somewhat broadened range of privileges and opportunities."

[5] The case management reviews dated June 6, 2013, indicated that his case was still pending investigation.

was formerly referred to as the Maximum Security Unit Case Management Committee. Id. Attached as Exhibit G are copies of many of the reviews completed by the MSU Case Management Committee.[6] Id. Additionally, the Staff Memoranda which is included in the Plaintiff's Warden's jacket (Exhibit H) to further document the MSU monthly reviews. Id. On December 9, 2014, Plaintiff was officially admitted to the MSU when the MSU Review Board met and unanimously recommended his admission to the MSU "due to an on-going investigation involving an assault on Captain Johnson." Id. Michael McCall, Deputy Director for Operations, concurred in the decision. Id. Plaintiff appealed that decision to the SCDC Director Bryan Stirling who denied the appeal by response dated April 9, 2015. Exhibit J. Plaintiff's placement was reviewed by the Maximum Security Unit Review Board on July 14, 2015, when the Board unanimously recommended that Plaintiff remain in MSU based upon the on-going investigation. Exhibit K. Again, Michael McCall concurred as Deputy Director For Operations. Id. Plaintiff was placed and remains designated as an MSU inmate because of the investigation into his involvement in the assault on Captain Johnson. Id. Patterson attests that SCDC has not been advised that the

---

[6] It appears that he was reduced to Level I in July 2013 based on some incidents which occurred while in MSU. Exhibit G. However, he returned to Level III.

investigation by the FBI and the United States Attorney's Office that Plaintiff has been cleared, and the investigation remains ongoing. Id.

Prior to November 5, 2015, SCDC Policy Number OP-22.11 governed the operation of the MSU and is attached as Exhibit M. Id. On November 5, 2015, SCDC adopted a new policy designated as SCDC Policy Number OP-22.38 entitled "Restrictive Housing Unit." Id. The policy supersedes SCDC Policies Op-22.11 and OP-22.12, the former of which governed the MSU. Id. SCDC Policy Number OP-22.38 has been renamed the Maximum Security Unit as the Substantiated Security Risk Unit and governs the operation of that unit. Id. A copy of this SCDC Policy is attached as Exhibit L. Id. As an SSR inmate under SCDC Policy Number OP-22.38, Plaintiff is entitled to 90-day hearings before the SSR Case Management Committee where he is allowed to be present either in person or by video conference and to participate in the hearing. Id. The SSR Case Management Committee reviews are governed by Paragraph 11.2 of SCDC Policy Number OP-22.38.  Id. Plaintiff was scheduled to appear *via* video conference before the Kirkland SSR Case Management Committee on January 21, 2016. Id.

Defendants submitted the affidavit of Jaylen Mitchell who attests that she is employed by the SCDC as a Classification Caseworker at Kirkland Reception and Evaluation Center. (Mitchell affidavit, doc. #42-3). Mitchell is assigned to the

13

Substantiated Security Risk Unit (SSR) which was formerly known as the Maximum

Security Unit (MSU), located at Kirkland. Id. Mitchell attests that she has very limited

personal knowledge of Plaintiff and has had little or no direct or in-person dealings

with him. Id. She understands that Plaintiff was transferred to the MSU in March 2010

and remained there until June 25, 2013, at which time he was transferred to PCI. Id.

Mitchell asserts that she had no responsibilities for classification at the MSU until

2013. Id. Since Plaintiff was transferred to PCI, he has remained an MSU inmate so

that classification functions including reviews are handled by the classification

officials at Kirkland, including Mitchell. Id. Plaintiff has received reviews by the SSR

Case Management Committee formerly called the Maximum Security Unit Case

Management Committee. Id. As a caseworker, Mitchell is responsible for providing

Plaintiff with disposition of the reviews by the SSR Case Management Committee.

Id. Mitchell avers that she forwarded those dispositions to the classification staff at

PCI and believes they were provided to Plaintiff. Id. Mitchell has played no role in the

assignment of Plaintiff to the MSU nor his continued treatment as an MSU inmate

while housed at PCI. Mitchell attests that she has never sent a psychologist to

interview Plaintiff at PCI as alleged nor has any knowledge of that occurring. Id.


## **EIGHTH AMENDMENT CONDITIONS OF CONFINEMENT**

14

As set forth above, Plaintiff asserts that his prison conditions at Perry Correctional Institution (PCI) where he has been housed in the Special Management Unit (SMU)[7] from June 25, 2013, through present, violate the Eighth Amendment. Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, and medical care ...." Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment, however, "does not mandate comfortable prisons." Rhodes v. Chapman, 452 U.S. 337, 349 (1981); see also Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995) (internal citation omitted) ("[T]he ordinary discomfort accompanying prison life is part and parcel of the punishment those individuals convicted of criminal offenses endure as recompense for their criminal activity. Accordingly, only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim."). To succeed on an Eighth Amendment claim, an inmate must "show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (internal quotation marks omitted). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir.1993) ("[A] prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the

---

[7] SMU is now referred to as the Restrictive Housing Unit. (See Cartledge's affidavit, doc. 42-2).

meaning of the' Eighth Amendment.") (citation omitted). "[T]he Constitution does not mandate comfortable prisons, and prisons . . . which house persons convicted of serious crimes, cannot be free of discomfort." Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). "To the extent such conditions are restrictive and even harsh, they are part of the penalty that criminals pay for their offenses against society." Id. at 338. Also, decisions relating to the day-to-day operation of prisons are entrusted to the officials of the particular institution or correctional system. See Ohm v. Wakinekona, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed. 813 (1983).

Under the first prong, a prisoner must establish that the prison condition was a "sufficiently serious" deprivation of a basic human need. Farmer, 511 U.S. at 825. However, not every injury suffered by a prisoner "translates into constitutional liability for prison officials." Id., 511 U.S. at 834. Rather, "[o]nly extreme deprivations are adequate to satisfy" this objective component. De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003). In order to establish such an extreme deprivation, an inmate must show "a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions." Odom v. S.C. Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003) (internal quotation marks omitted).

The second prong involves a subjective analysis requiring plaintiff to establish that a defendant had a "sufficiently culpable" state of mind. Strickler, 989 F.2d at 1381. The Supreme Court has defined this state of mind requirement to mean deliberate indifference. Wilson v. Seiter, 501 U.S. 294, 303-304 (1991). "Deliberate indifference entails something more than mere negligence, ... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." See Farmer, 511 U.S. at 835. It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. Id. at 837; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995). The Fourth Circuit has adopted a "totality of the circumstances test," for reviewing Eighth Amendment claims. Mitchell v. Rice, 954 F.2d 187, 191 (4th Cir. 1992)

Plaintiff complains being housed as an MSU inmate at PCI has resulted in the loss of normal privileges such as, but not limited to, being able to have the same meals as others, loss of outdoor recreation, loss of some visitation privileges, canteen privileges, loss of television privileges, indoor recreation time limited to one hour a day while in restraints, as well as other limitations or privileges. The conditions Plaintiff alleges at PCI have not been shown to be unlike the conditions experienced by any inmate housed in restrictive housing as an MSU inmate. Wilkinson v. Austin,

17

545 U.S. 209, 211 (2005) ("For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities.").  Plaintiff receives indoor exercise opportunities for an hour a day five days a week and is not denied all exercise. Plaintiff complains that he does not receive pancakes and chicken like the other inmates in restrictive housing but does not deny that he receives meals. While Plaintiff went on a hunger strike at one point because of his denial of certain foods, he has not shown any medical condition attributable to not receiving chicken and pancakes or meals in general. Furthermore, Plaintiff, does not have a constitutional right to many of the complained of conditions. Plaintiff does not have a constitutional right to canteen, television, education programs, vocational programs, or unlimited telephone privileges. See Moody v. Daggett, 429 U.S. 78, 88 n. 9 (1976) (finding that inmates do not have a constitutional right to access educational or rehabilitative programs); U.S. v. Alkire, No. 95-7885, 1996 WL 166400, at *1 (4th Cir. Apr.10, 1996) (finding no constitutional right to the use of a telephone in prison); Beck v. Lynaugh, 842 F.2d 759, 762 (5th Cir. 1988) (state has no constitutional obligation to provide basic educational or vocational training

18

programs to prisoners) (citation omitted); Bennett v. Cannon, C/A No. 2:05–2634–GR, 2006 WL 2345983, at *2 (D.S.C. Aug.10, 2006) ("[t]here is simply no freestanding constitutional right to canteen privileges at all"). Finally, plaintiff does not have a constitutional right to visitation. See White v. Keller, 438 F. Supp. 110, 115 (D. Md. 1977), aff'd, 588 F.2d 913 (4th Cir. 1978). Considering the MSU conditions as a whole, Plaintiff is unable to satisfy the objective prong of the Eighth Amendment test because the conditions described by Plaintiff do not violate contemporary standards of decency. See Beverati v. Smith, 120 F.3d 500, 503 (4th Cir. 1997); In re Long Term Admin. Segregation of Inmates Designated as Five Percenters v. Moore, 174 F.3d 464, 471-473 (4th Cir. 2003) (holding that "isolation inherent in administrative segregation or maximum custody is not itself constitutionally objectionable" and that "the restrictive nature of high-security incarceration does not alone constitute cruel and unusual punishment."); see also, Gallishaw v. Reed, No. 9:09-2566-CMC-BM, 2010 WL 2622931, at *9 (D.S.C. May 28, 2010) ("During the time period set forth in the complaint, Plaintiff was a prisoner in a state correctional facility, not a hotel. It should be expected that conditions in such a setting are oftentimes less than ideal.") (citations omitted), aff'd, 397 Fed.Appx. 852 (4th Cir. 2010); Harris v. Fleming, 839 F.2d 1232, 1236 (7th Cir. 1988) ("Inmates cannot expect the amenities, conveniences and services of a good hotel."). Plaintiff further

has not established that he suffered from any serious physical or mental injury as a result of the conditions of his incarceration as an MSU inmate in restrictive housing at PCI. Thus, Plaintiff is unable to establish the objective prong of the Eighth Amendment test.

Even if Plaintiff could satisfy the objective prong of the Eighth Amendment test with respect to his prison conditions, which the court maintains that he cannot, he is unable to establish an Eighth Amendment claim because he fails to satisfy the second prong of the Eighth Amendment test. Specifically, Plaintiff has set forth no evidence to establish that any named defendant acted with wantonness with respect to his prison conditions. In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d at 472 ("Since the Five Percenters have failed to come forward with evidence from which it can be inferred that the defendant-officials were . . . knowingly and unreasonably disregarding an objectively intolerable risk of harm . . . summary judgment on this claim was likewise proper on the basis of the defendants' state of mind.") (internal quotation and citation omitted.) Thus, Plaintiff fails to establish the subjective prong of the Eighth Amendment test, and there is no constitutional violation. Therefore, it is recommended that Defendants' motion for summary judgment should be granted with respect to this claim.

## FOURTEENTH AMENDMENT DUE PROCESS CLAIM

In his amended complaint, Plaintiff alleges a violation of his due process rights

when he was transferred in June 2013 from the MSU at KCI to Perry Correctional

Institution (PCI) where he has been housed in the Special Management Unit (SMU)[8]

but designated as an MSU inmate.[9] Plaintiff alleges that his due process rights were

violated when he was transferred from KCI to PCI without being evaluated by the

Case Management Committee pursuant to SCDC policy. Specifically, Plaintiff asserts

that he continues to be housed in the SMU as an MSU inmate for his alleged

involvement in a murder-for-hire scheme, but he has not yet been charged or

convicted.[10] As a result of continuing to be designated as an MSU inmate while still

under investigation, Plaintiff alleges that the conditions as an MSU inmate in

restrictive housing are atypical and significant. Specifically, Plaintiff asserts since he

was transferred from Kirkland, he has to wait until all of the inmates in his dorm at

---

[8] SMU is now referred to as the Restrictive Housing Unit. (See Cartledge's affidavit, doc. 42-2).

[9] Plaintiff contends that MSU at Kirkland is the only one like it in the SCDC. Therefore, since Perry is not designated as an MSU facility, he was housed in the SMU but designated and treated as an MSU inmate. (See amended complaint).

[10] Plaintiff asserts that he was informed that the investigation had concluded, and he was not being charged. Defendants assert that Plaintiff is still under investigation for his part in the murder-for-hire scheme by the Federal Bureau of Investigation (FBI) and United States Attorney's Office which have instructed the SCDC that Plaintiff is to remain an MSU inmate pending the investigation.

PCI have showered before he is allowed to shower. He alleges that as a result he missed a shower on August 28, 30 and September 4, 13, 18, and 23 in 2013, due to time running into the next shift with not enough personnel because there has to be a Lieutenant or higher in rank present along with two other officers for him to be allowed to leave his cell to shower. Additionally, Plaintiff asserts he was served food on a plastic tray at KCI but has been served food on a styrofoam tray since arriving at PCI. Further, Plaintiff contends he has been denied pancakes and chicken for brunch at PCI but was allowed to have chicken without the bones and pancakes at Kirkland. Also, Plaintiff asserts he was allowed a television while at Kirkland but has not been allowed one at PCI.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In order to determine whether a due process violation has occurred, an initial determination must be made that a protected liberty interest exists and, if so, the next step is to define what process is mandated to protect it. See Sandin v. Conner, 515 U.S. 472, 484 (1995).

Generally, prisoners do not have a constitutionally recognized liberty interest in a particular security classification or to be confined in a particular prison. Hewitt v. Helms, 459 U.S. 460, 468, 103 S.Ct. 864 (1983). In order to demonstrate a liberty

interest meriting procedural due process protections, an inmate must show "(1) denial of an interest that can arise . . . from state laws or policies," and that (2) this denial imposed on him is an atypical and significant hardship . . . in relation to the ordinary incidents of prison life." Prieto v. Clarke, 780 F.3d 245, 251 (4th Cir. 2015) (internal quotations omitted); Incumaa v. Stirling, 791 F.3d 517, 527 (4th Cir. 2015); Sandin, 515 U.S. at 484; see Wilkinson, 545 U.S. at 221-222.

Fourth Circuit Court of Appeals provided guidance in evaluating prison conditions in the context of the test set forth in Sandin. Incumaa, 791 F.3d at 527. Specifically, the court in Incumaa stated:

> Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary incidents of prison life" is a "necessarily ... fact specific" comparative exercise. Beverati v. Smith, 120 F.3d 500, 502, 503 (4th Cir. 1997); accord Ramirez v. Galaza, 334 F.3d 850, 861 (9th Cir. 2003) ("There is no single standard for determining whether a prison hardship is atypical and significant, and the condition or combination of conditions or factors ... requires case by case, fact by fact consideration." (alteration in original) (internal quotation marks omitted)). In [Prieto v. Clarke, 780 F.3d 245, 249 (4th Cir. 2015)], we recognized that the Sandin standard contains two parts. Cf. Prieto, 780 F.3d at 253–54. First, we determine what the normative "baseline" is: what constitutes the "ordinary incidents of prison life" for this particular inmate? Id. at 253 ("What the inmates in Beverati could expect to experience and what Prieto can expect to experience differ significantly. ... For conditions dictated by a prisoner's conviction and sentence are the conditions constituting the 'ordinary incidents of prison life' for that

23

prisoner.") Then, with the baseline established, we determine whether the prison conditions impose atypical and substantial hardship in relation to that norm. See id. at 254 (holding that Prieto's death row confinement did not impose atypical and significant hardship in relation to the ordinary incidents of prison life).

Id.

This case is presented in an unusual posture. Plaintiff contends that his due process rights were violated when he was transferred from KCI to PCI without a Committee evaluation. Thus, Plaintiff's "baseline" is KCI. See Prieto v. Clarke, 780 F.3d 245 (4th Cir. 2015). Whether confinement conditions are atypical and subsequently harsh in relation to the ordinary incidents of prison life for a particular plaintiff is necessarily a fact specific comparative exercise in a Fourteenth Amendment procedural due process. Incumaa, supra citing Bervati v. Smith, 120 F.3d 500, 502, 503 (4th Cir. 1997).

Three non-exclusive factors to consider in evaluating a claim of atypical and significant hardship include (1) the magnitude of confinement restrictions; (2) the duration of the restrictions; and (3) any collateral consequences on the inmate's sentence as a result of the restrictions. Wilkinson, 545 U.S. at 224; Incumaa, 791 F.3d at 530. Again, Plaintiff complains of his transfer to PCI from KCI. Thus, his appropriate baseline is KCI. See generally Incumaa, 791 F.3d at 526-533; Beverati v. Smith, 120 F.3d 500, 502-503 (4th Cir. 1997); Prieto v. Clark, 780 F.3d 245, 252-54

(4th Cir. 2015). As set forth above, Plaintiff was housed in MSU at Kirkland before being transferred to Perry where he remained an "MSU" inmate. He complains that upon transfer, he was not allowed a television, was denied certain foods (chicken and pancakes), was served food on styrofoam instead of plastic trays/ plates, and had more restrictive shower procedures. Plaintiff fails to show a significant change in restrictions as a result of this transfer.[11]

Regarding duration, courts have been particularly concerned with duration that is indefinite. In the present case, it appears that the duration of his restrictions is tied to the duration of the investigation by the FBI and the United Sates Attorney's office; however, duration in this case is far short of that found "indefinite" in Incumaa (two decades); Wilkinson (39 years); But see Incumaa, 791 F.3d at 534 (noting the language in Wilkerson, 774 F.3d at 856, looking disfavorably upon a prison's " rote repetition" of continued confinement rendering the restrictive confinement "effectively indefinite"). While this is the more troubling factor in this case, under these facts, including the frequency of review, Plaintiff fails to show these restrictions are indefinite.

---

[11] It is noted that it does not appear that Plaintiff is "deprived of almost any environmental or sensory stimuli and of almost all human contact." Incumaa, 791 F.3d 530 (citing Wilkerson, 545 U.S. at 224). See generally Exhibit L to Defendant's motion for summary judgment; affidavits submitted by Plaintiff indicating contact with other inmates. (Doc. 53-1).

Finally, there is no indication that there are any collateral consequences on Plaintiff's sentence as a result of the restrictions.

Assuming, for the sake of argument, that the Plaintiff's baseline is other than KCI MSU[12] and he has made a sufficient showing to establish liberty interest arising out of his placement at PCI, he is entitled to due process.

To determine whether a plaintiff has received process due, the court considers three factors set forth in <u>Matthews v. Eldridge</u>, 424 U.S. 319, 96 S.C. 893 (1976) which are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

<u>Id</u>. at 334-335; <u>see also</u>, <u>Wilkinson</u>, 545 U.S. at 224-25 (applying these factors).

The "touchstone of due process is protecting the individual against arbitrary action of government." <u>Meachum v. Fano</u>, 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.E. 2d 451 (1976) (internal citation omitted). "[T]he quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing

---

[12] Plaintiff fails to show what that baseline might be.

the risk of error." Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 U.S. 1, 13, 99 S.Ct. 2100 (1979)(internal citation omitted).[13]

Again, assuming MSU at KCI is not the proper baseline and that he has an interest in not being in MSU, his interest must be weighed against the government's interest. The State's "first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoner's themselves." Wilkinson, 545 U.S. at 227; Hewitt, 459 U.S. 474 ("safety of the institution's guards and inmates is perhaps the most fundamental responsibility of the prison administration"). The state's interest under the facts of this case is great.

There is no dispute that upon first being placed in MSU in 2010, Plaintiff was given notice and was present at the hearing. Additionally, as set forth above, he had a right to and did appeal the decision and has had a number of periodic reviews both under the old SCDC Policy/Procedure #OP-22.11  and the rule promulgated after Incumaa, Policy #OP-22.38. Under state law, Plaintiff could have continued to challenge the veracity of that decision through the state court system. Al Shabazz v. State, 338 S.C. 354, 527 S.E.2d 742 (2000).

---

[13] Although Greenholtz was abrogated on other grounds by Sandin, it and Hewitt remain instructive on the amount of process due. Wilkinson, 545 U.S. at 229.

Considering the three <u>Matthews</u> factors, Plaintiff fails to create an issue of fact as to whether he received the process due. Based on the above, it is recommended that Defendants' motion for summary judgment be granted.

## Use of Force

In his amended complaint, Plaintiff alleges a use of force incident that occurred on July 12, 2013, at PCI which he attempts to claim is connected to his treatment as an MSU inmate. However, Plaintiff has not alleged or demonstrated that any of the named Defendants were personally involved in the alleged incident. <u>See</u> reports for the incident attached to Cartledge's affidavit. Therefore, it is recommended that claims of excessive force be denied as to these Defendants.[14]

## Defendant Mitchell

As to Defendant Jaylen Mitchell, Plaintiff alleges that she sent a psychologist to interview him at PCI. Defendants submitted the affidavit of Jaylen Mitchell (Mitchell) who attests that she forwarded the dispositions of the SSR Case Management Committee to the classification staff at PCI to be provided to Plaintiff. (Mitchell affidavit, doc. #42-3). Mitchell denies any knowledge of sending a psychologist to see the Plaintiff.  <u>Id</u>. Even if true, Plaintiff has failed to show how his

---

[14] As to any allegations Plaintiff has made regarding the grievance procedure at PCI, it is recommended that these allegations be dismissed as there is no constitutional right to participate in grievance proceedings. <u>Adams v. Rice</u>, 40 F.3d 72, 75 (4th Cir. 1994).

constitutional rights were violated by the alleged conduct. Id. Therefore, it is recommended that any allegations as to Mitchell be dismissed.

## QUALIFIED IMMUNITY

Defendants deny that any of the alleged conduct or conditions complained of by Plaintiff gives rise to a constitutional violation. However, Defendants assert that, even if this Court concludes that the facts are sufficient to establish a Constitutional claim, they are entitled to qualified immunity.

> The doctrine of qualified immunity attempts to reconcile two potentially conflicting principles: the need to deter government officials from violating an individual's federal civil rights and the need for government officials to act decisively without undue fear of judicial second guessing.

Akers v. Caperton, 998 F.2d 220, 225-26 (4th Cir. 1993).

The Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800 (1982), established the standard which the court is to follow in determining whether Defendant is protected by this immunity.

> Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Harlow, 457 U.S. at 818.

In a discussion of qualified immunity, the Court of Appeals for the Fourth Circuit stated:

> Qualified immunity shields a governmental official from liability for civil monetary damages if the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." "In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Moreover, "the manner in which this [clearly established] right applies to the actions of the official must also be apparent." As such, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

Wiley v. Doory, 14 F.3d 993 (4th Cir. 1994) (internal citations omitted), cert. denied, 516 U.S. 824 (1995). As discussed above, the Plaintiff fails to show that Defendants violated any of his clearly established constitutional or statutory rights as they were following policy at the time. Once the Fourth Circuit issued its order in Incumaa, the policy was changed to comply with the new law. However, even if there was a violation, Defendants are entitled to qualified immunity. The record before the court shows that Defendants performed the discretionary functions of their respective official duties in an objectively reasonable fashion. Defendants did not transgress any statutory or constitutional rights of Plaintiff of which they were aware in the exercise

of their respective professional judgments. Thus, the undersigned recommends that summary judgment be granted as to these Defendants.

## PENDENT JURISDICTION

Assuming Plaintiff's § 1983 claim is dismissed by this Court and Plaintiff's complaint somehow can be conceived to state an additional claim for relief under any state common law theory, the undersigned concludes that such claim(s), if any, ought to be dismissed as well for want of jurisdiction. Specifically, this Court can decline to continue the action as to the pendent claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)

## CONCLUSION

Based on the above reasoning, Plaintiff has failed to show that Defendants violated any of his constitutional or statutory rights under 42 U.S.C. § 1983.  It is therefore, for the reasons stated herein,

RECOMMENDED that the Defendants' motion for summary judgment (doc.#42) be GRANTED IN ITS ENTIRETY and the case dismissed.

IT IS FURTHER RECOMMENDED that any outstanding motions be deemed MOOT.

Respectfully submitted,


s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

August 2, 2016
Florence, South Carolina

The parties' attention is directed to the important information on the attached notice.